# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Max Luc Taxi, Inc., Tiger Taxi, Inc., | ) |
| Loomans Cab, Inc., Joyce Cab, Inc., | ) |
| Valley Taxi, Inc., Rachel Cab, Inc., | ) |
| Michael JoJo Cab, Inc., Emma Jane Cab, Inc., | ) Civil Action No.: 1:17-cv-10316-NMG |
| Teddy G., Inc., Warrior Taxi, Inc., | ) |
| Ralphy Taxi, Inc., G Money Cab, Inc., | ) |
| Jo G Cab, Inc., and M.L.J. Taxi, Inc., Crusader | ) |
| Taxi, Inc., Linda) Garofalo D/B/A LAG Medallion | ) |
| Financing, Nancy Gargano D/B/A NAG Mortgage, | ) |
| Erminio Gargano D/B/A EG Mortgage | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Uber Technologies, Inc., | ) |
| Defendant. | ) |

## FIRST AMENDED COMPLAINT

Plaintiffs, Max Luc Taxi, Inc., Tiger Taxi, Inc., Loomans Cab, Inc., Joyce Cab, Inc.,

Valley Taxi, Inc., Rachel Cab, Inc., Michael JoJo Cab, Inc., Emma Jane Cab, Inc., Teddy G.,

Inc., Warrior Taxi, Inc., Ralphy Taxi, Inc., G Money Cab, Inc., Jo G Cab, Inc., and M.L.J. Taxi,

Inc., Crusader Taxi, Inc.,  Linda Garofalo D/B/A LAG Medallion Financing, Nancy Gargano

D/B/A NAG Mortgage, Erminio Gargano D/B/A EG Mortgage (collectively referred to as

"Plaintiffs"), as and for their complaint against defendant Uber Technologies, Inc. ("Uber")

allege as follows:

## INTRODUCTION

1.      Plaintiffs provide taxi services and manage leased taxi cabs in the City of Boston

and the City of Cambridge. They have invested substantial capital in complying with municipal

rules and state laws, developed over the last several decades, that protect consumers, ensure

public safety, and provide non-discriminatory service. Uber has created an illegal transportation

service that violates state laws and municipal ordinances and deceives consumers regarding, *inter alia*: the fares they must pay to use Uber's services; the safety of the vehicles used by and/or on behalf of Uber and the individuals driving those vehicles.

2.      The product market relevant to the antitrust cause of action is the low-cost, on-demand, Ride-Hail ground transportation services that originate in Boston and Cambridge that seat 3-4 passengers ("Ride-Hail Market"). The geographic market includes Boston and Cambridge.  Upon information and belief, Uber currently controls in excess of 80% of the Ride-Hail Market.

## PARTIES AND JURISDICTION

3.      Max Luc Taxi, Inc. is a Massachusetts corporation and maintains a principal place of business at 257 Columbia Road, Dorchester, MA 02121.

4.      Tiger Taxi, Inc. is a Massachusetts corporation and maintains a principal place of business at 257 Columbia Road, Dorchester, MA 02121.

5.      Loomans Cab, Inc. is a Massachusetts corporation and maintains a principal place of business at 257 Columbia Road, Dorchester, MA 02121.

6.      Joyce Cab, Inc. is a Massachusetts corporation and maintains a principal place of business at 257 Columbia Road, Dorchester, MA 02121.

7.      Valley Taxi, Inc. is a Massachusetts corporation and maintains a principal place of business at 257 Columbia Road, Dorchester, MA 02121.

8.      Rachel Cab, Inc. is a Massachusetts corporation and maintains a principal place of business at 303 Geneva Avenue, Dorchester, MA 02121.

9.      Michael JoJo Cab, Inc. is a Massachusetts corporation and maintains a principal place of business at 303 Geneva Avenue, Dorchester, MA 02121.

10.     Emma Jane Cab, Inc. is a Massachusetts corporation and maintains a principal place of business at 303 Geneva Avenue, Dorchester, MA 02121.

11.     Teddy G., Inc. is a Massachusetts corporation and maintains a principal place of business at 303 Geneva Avenue, Dorchester, MA 02121.

12.     Warrior Taxi, Inc. is a Massachusetts corporation and maintains a principal place of business at 257 Columbia Road, Dorchester, MA 02121.

13.     Ralphy Taxi, Inc. is a Massachusetts corporation and maintains a principal place of business at 257 Columbia Road, Dorchester, MA 02121.

14.     G Money Cab, Inc. is a Massachusetts corporation and maintains a principal place of business at 303 Geneva Avenue, Dorchester, MA 02121.

15.     Jo G Cab, Inc. is a Massachusetts corporation and maintains a principal place of business at 303 Geneva Avenue, Dorchester, MA 02121.

16.     M.L.J. Taxi, Inc. is a Massachusetts corporation and maintains a principal place of business at 257 Columbia Road, Dorchester, MA 02121.

17.     Crusader Taxi, Inc. is a Massachusetts corporation and maintains a principal place of business at 6 Partridge Hill Road, Andover, MA 01810.

18.     Linda Garofalo D/B/A LAG Medallion Financing ("LAG") maintains a principal place of business at 6 Partridge Hill Road, Andover, MA 01810.

19.     LAG is the assignee of all claims against Uber as defined by the Assignment of Claim for Collection between LAG and the following parties: Tchelie Cab, Inc., St Louis Transportation, Inc., Zanata Cab, Inc., Robin & Claudy Cab, Inc., L. Rose Cab, Inc., Venus Cab, Inc., Sunward Cab, Inc., and Inwood Transportation Inc.

20.     Nancy Gargano D/B/A NAG Mortgage ("NAG") maintains a principal place of

business at 26 Valley Road, Stoneham, MA 02180.

21.    NAG is the assignee of all claims against Uber as defined by the Assignment of Claim for Collection between NAG and Love Colas, Inc.

22.    Erminio Gargano D/B/A EG Mortgage ("EG") maintains a principal place of business at 26 Valley Road, Stoneham, MA 02180.

23.    EG is the assignee of all claims against Uber as defined by the Assignment of Claim for Collection between EG and Oke Rochel Cab, Inc.

24.    Plaintiffs are engaged in interstate commerce and commerce within the Commonwealth.

25.    Upon information and belief, defendant Uber is a Delaware corporation with principal offices at 800 Market Street, San Francisco, California.  This Court has personal jurisdiction over Uber, as Uber operates a transportation-for-hire service in Boston and other Massachusetts communities, consisting of unlicensed personal vehicles owned by individual drivers and offered through a cut-rate service advertised by Uber as "UberX."

26.    Defendant Uber is engaged in interstate commerce and in commerce within the Commonwealth of Massachusetts.

27.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332, as Uber is a foreign corporation doing business in Massachusetts and the amount in controversy exceeds $75,000. Counts III arises under the laws of the United States, thus also conferring federal jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## **FACTS**

### *Regulation of Taxis in Boston and Cambridge*

29.    The taxi industry is highly regulated by state statutes, municipal rules and ordinances, and multiple agreements that specify how medallion owners, radio associations and drivers must operate together. These legal controls are designed to protect consumers and ensure that taxi services in their respective municipalities will operate both safely and reliably.

30.    Pursuant to M.G.L. c. 40, § 22 municipalities have been given the authority to regulate vehicles used for the conveyance of persons for hire from place to place.

31.    Boston and Cambridge enacted legislation for the regulation of the taxi industry ("Taxi Rules").

32.    The City of Boston enacted Rule 403 through the Boston Police Hackney Carriage Unit, which applies to all vehicles "used or designed to be used for the conveyance of persons for hire from place to place within the city of Boston."

33.    The City of Cambridge enacted the "Taxicab Rules and Regulations" which applies to "[e]very vehicle used for the conveyance of persons for hire from any point of origin within the City to any other location." Cambridge City Code c. 5.20, Art. I § 5.20.010.

34.    The current version of the Taxi Rules are the product of decades of revisions, designed to protect consumers, ensure public safety, safeguard competition, and provide non-discriminatory taxi services to all areas of the city and to the elderly and disabled.  Plaintiffs and all licensed taxi owners operating in Boston and Cambridge have invested significant capital and resources to develop systems and infrastructure that meet the broad-ranging requirements of the Taxi Rules.

35.    The Taxi Rules use three fundamental methods of ensuring that taxi service is safe, reliable, and non-discriminatory: first, Boston and Cambridge issue a limited number of taxi licenses.  A taxicab cannot operate legally in Boston or Cambridge without a city-issued taxi

medallion and medallion owners must have cabs that meet strict requirements concerning vehicle age, condition, and installed equipment (for example, computerized dispatch machines, taximeters and approved credit card machines). Second, every cab must be a member of an approved "radio association." Third, every taxi driver must have a license to operate a taxi cab within Boston and Cambridge and comply with extensive rules of conduct promulgated by the municipality (for example, requirements for dealing with handicapped passengers, allowed fares and charges, anti-discrimination requirements and prohibitions on cell phone use).

### *Uber*

36.     Uber is an interstate transportation service that, in the relevant Ride-Hail Market, owns no taxis and pays none of the substantial capital costs or ongoing expenses required to operate legal taxi car businesses. Uber offers UberX low-cost conveyance-for-hire vehicles to, inter alia, Boston and Cambridge travelers. UberX is a cut-rate, unlicensed taxi service.

37.     Uber's transportation system communicates with customers through a free smart phone application ("app"). The Uber app gives consumers the ability to hail an UberX car that seats 3-4 passengers. The user opens the Uber app, which displays: a map of the user's location (or designated pickup point); the available UberX cars at and around that location; and displays how long the user will have to wait for each UberX car. After electronically hailed by the user, Uber's out-of-state computer system selects an UberX-affiliated car, displays the driver's name and photograph on the user's smart phone, and sends a text message to the user with the driver's projected arrival time and cell phone number.

### *Uber's Unlawful Approach to Competition*

38.     Uber's business plan and activity illegally undermines critical safety provisions of the municipal Taxi Rules. Uber's UberX transportation system preys parasitically on established

taxi services without paying for them and without obeying the laws designed to protect taxi passengers. Uber owns no cars, no medallions, no licenses and no radio associations. It induces its drivers or "partners" to illegally substitute Uber's computerized dispatching system for the legal dispatching system in each respective municipality. In doing so, Uber knowingly induces its drivers to violate the Taxi Rules.

39.     Uber illegally competes with taxis in Boston and Cambridge. Uber violates nearly all substantive Taxi Rules by: misleading its customers, forcing drivers who sign up with Uber to violate licensing laws, and discriminating unlawfully against handicapped and elderly users of public transportation.

40.     Uber undermines the existing taxi market by having unregulated UberX cars function as cabs. Boston and Cambridge require that all taxis have a medallion and set a limit on the number thereof issued in each respective municipality. Uber violates this legal limit—and public safety—by signing up an unregulated and unaccountable legion of UberX vehicles (for example, Uber has over 20,000 cars in the City of Boston), and linking them to customers in direct competition with taxis and in direct violation of the Taxi Rules.

41.     Uber's campaign to attract taxi drivers is a carefully crafted plan to insert itself, at little or no cost and without legal authority, into the taxi infrastructure that has existed long before Uber began offering its services. Uber profits by taking parasitic advantage of a transportation system in which all other players must comply with safety and consumer protections rules established by state and city laws.

42.     The Taxi Rules produced a set of rules designed to meet the needs and protect the rights of individuals who need a car and driver on short notice—i.e., a taxi. Technological advances have made taxi dispatching more efficient over the years; however, Uber's approach

ignores and defies all taxi regulations designed to protect consumers who suffer from disabilities, or who live in less secure neighborhoods.

### *Uber's Illegal Operation of UberX Vehicles*

43.     Uber's business strategy is aimed directly at undermining the existing legal protections consumers receive under the Taxi Rules.

44.      In early 2013, Uber began promoting UberX, known as "the Low Cost Uber," as the economical substitute for all other Uber vehicles.

45.     UberX is a cut-rate version of Uber Black Cars and SUVs.  In early 2013, Uber's promotional material told every owner of a Prius, Camry, Altima, Taurus or Fusion (2006 or later) with a Massachusetts Driver's License and a commercial insurance policy that he/she could become an Uber vehicle simply by demonstrating "city knowledge and professionalism" and completing a one-hour "on-boarding session."  Equipment does not need to meet any of standards set forth in the Taxi Rules.  Drivers did not need to pass any of the criminal record or driving record standards for Boston or Cambridge taxi drivers, and did not need to comply with the Taxi Rules that protect riders and neighborhoods against discrimination.  UberX-affiliated cars are assigned by a set of out of state computers with no real- time connection to the Boston or Cambridge Police Departments and no ability to respond to public safety emergencies.

46.     By non-compliance with municipal regulations, UberX is able to and does charge lower rates than licensed cabs.

47.     In 2014, Uber's marketing approach was designed to convince consumers to perceive UberX vehicles as the inexpensive alternative to taxis.  But Uber's fleet of UberX vehicles is, in practice, an unlicensed—and dangerous—group of taxis. Uber's own CEO, Travis Kalanick, has referred to the practice of unlicensed vehicles operating for hire as "regulatory

arbitrage" and their operations as unlicensed taxis as constituting a "criminal misdemeanor."[1] Uber recognized that it was subject to the same rules as taxis yet employed advanced measures to actively evade enforcement by local authorities. Those measures included using a feature known as "Greyballing" which blocked suspected city officials and regulators from calling drivers. This feature thwarted regulator's efforts to prevent unlicensed taxicabs from operating in their cities in direct violation of the Taxi Rules. *See* www.nytimes.com/2017/03/03/technology/uber-greyball-program-evade-authorities.html?_r=0; https://newsroom.uber.com/an-update-on-greyballing/. UberX vehicles are hailed by, inter alia, a smart phone App, assigned to customers through the same Uber computer system, and have fares determined by Uber's computers. UberX vehicles function as roving conveyances for hire in Boston and Cambridge, and are assigned in response to an "electronic hail" just as quickly as a taxi. Uber itself agrees that its affiliated autos function as taxis, claiming to New York taxi regulators that the Uber system is a "virtual hail" equivalent to standing on a street corner and flagging a cab.

48.    From early 2013 to the present, all UberX vehicles have been subject to the Taxi Rules. As a result, Uber-affiliated vehicles are not permitted to operate without a medallion and a driver who is licensed pursuant to the Taxi Rules. For example, the City of Boston's ordinance is clear:

> In said city, no person shall drive or have charge of a hackney carriage, nor shall any person, firm or corporation set up and use a hackney carriage, unless licensed thereto by the Police Commissioner of the City of Boston; nor shall any person having the care or ordering of such a vehicle in said city suffer or allow any other person other than a driver so licensed to drive such a vehicle. *See* City of Boston Code 16-15.05: Vehicle for Hire

---

[1] http://money.cnn.com/video/technology/2013/07/24/t-bst-uber-lyft.fortune/index.html.

Ordinance (Appendix I to Rule 403).[2]

49.    Every UberX driver hailed electronically by an Uber customer in Boston and Cambridge, under the provisions of the municipal ordinances quoted above, must have a license. As none of them do, all UberX services in Boston and Cambridge are operating illegally.  This massive and illegal operation puts the public and consumers at risk in many ways.

### Risks of Uber's Illegal Operation of UberX

50.    The Taxi Rules protect the public from dangerous vehicles by requiring that all taxis be inspected to ensure they meet specific Taxi Rules standards for age, condition, equipment, lack of damage and cleanliness.[3] Uber ignores these requirements entirely and operates illegally with its affiliated UberX cars. UberX represents to the public and its customers that it inspects all of its fleet.  On information and belief, Uber superficially may inspect these vehicles when the owner first signs up.  Uber, however, does not have a regular program of rechecking vehicle condition and licensing.

51.    The Taxi Rules protect the public from dangerous cab drivers by requiring license applicants to meet certain criteria before applying for a license. For example, the City of Boston requires an applicant to:

    1.    be twenty-one (21) years of age or older;

    2.    pass a standard examination demonstrating the ability to speak, read, write and understand the English Language;

    3.    participate in Hackney Carriage testing and training as determined by the Inspector of Carriages;

    4.    have an original Birth Certificate, Alien Card, Asylum Document, US Passport or Naturalization Papers;

---

[2] In the City of Cambridge, the taxicab industry is regulated by the Cambridge License Commission who has enacted the "Taxicab Rules and Regulations." They have incorporated a similar requirement at Article II, Rule 2 of the Taxicab Rules and Regulations.
[3] For example, the City of Boston enacted standards embodied at Rule 403, Section 3: Vehicles.

5.    not have a Hackney Carriage Driver's License that is revoked or suspended in any jurisdiction;

6.    have a valid Massachusetts Driver's License;

7.    have had a Driver's License in the United States for at least two (2) years;

8.    not have been adjudged a Habitual Traffic Offender, as defined by Massachusetts General Law Chapter 90, Section 22F, or the equivalent in any jurisdiction, within the past five (5) years;

9.    not have any outstanding or unresolved driving infractions which could result in the applicants Driver's License being suspended or revoked in any jurisdiction;

10.    not have had his or her Driver's License suspended for five (5) or more Surchargeable Incidents, as defined by Chapter 211 of the Code of Massachusetts Regulations section 134, or the equivalent in any jurisdiction, within past five (5) years;

11.    not have more than four (4) violations of the Traffic Laws and/or At-Fault Accidents as, defined by Chapter 211 of the Code of Massachusetts Regulations Section 134 or an equivalent department in the last three (3) years (violations and accidents occurring on the same date will count as only one) in any jurisdiction;

12.    not have any Operating Under the Influence of drugs or alcohol convictions or dispositions under Massachusetts General Law Chapter 90 section 24D within the past five (5) years or the equivalent in any jurisdiction;

13.    not have any felony convictions within the last five (5) years in any jurisdiction;

14.    not have any drug convictions in the last five (5) years in any jurisdiction;

15.    not have any dispositions for a criminal offense, in any jurisdiction, that would result in the denial of a license, including admissions to sufficient facts or continuance of an offense without resolution, unless the circumstances of such incident are reviewed by the Inspector of Carriages as to the specific facts and circumstances and the applicant is thus approved by the Inspector of Carriages;

16.    not be required to register as a sex offender in any jurisdiction; and

17. not have any outstanding or unresolved criminal court cases in any jurisdiction which could result in the license being denied if the Applicant was convicted of the alleged offense.

Rule 403, Section 2 (III)[4]

52. Uber violates the Taxi Rules by signing up UberX drivers who have not met the minimal requirements set forth by the Taxi Rules. Uber does not assure its customers that these drivers could meet any of the requirements of the Taxi Rules. According to Uber, anyone can drive an Uber-affiliated UberX car in Boston or Cambridge as long as they have a conventional Driver's License and insurance. Uber's complete list of the standards it applies in selecting drivers is as follows:

Uber driver-partners must:

- be at least 21 years old
- have at least one year of driving experience in the U.S.
- have at least 3 years of driving experience if under 23
- use an eligible 4-door vehicle (must be 2001* or later)
- vehicle must seat 4 passenger seats (not including the driver)
- consent to and pass a background screening
- use an iPhone 5 or newer, or an Android device running 4.0 or newer

In order to complete the signup process and start taking trips, please upload:

- your valid Driver's License
- proof of valid vehicle registration
- proof of insurance for the vehicle listed on your account (your name must be on the insurance document)
- your banking information

(https://help.uber.com/h/ec5c2be3-e3db-4389-a18b-10db2279b082) (compare with ¶43).

53. Uber has a "Rating System" that purports to provide a quality control measure for their drivers:

After each trip taken on the Uber platform, riders are given the opportunity to rate

---

[4] Similar guidelines can be found in the Taxicab Rules and Regulations at Article IX.

their driver. This 5 star rating system creates accountability and provides real-time data to the Uber team. Due to the immediate nature of the ratings, Uber is able to maintain a consistent and quality service offering

(https://newsroom.uber.com/canada/what-makes-us-uber/)

54.     Uber's alleged method of ensuring it has "quality" drivers, however, consists of a five-star "rating system" by which Uber riders can choose to rate their driver immediately after the ride.  Uber claims that if a driver dips below a certain star rating, Uber will "no longer do business with" that driver.  Uber does not tell its customers that every driver receives a five star rating just for signing up with Uber.  On information and belief, (i) a driver only drops below a "Five Star" rating if dissatisfied customers take the time to post negative reviews, and (ii) Uber continues to use drivers even after they have received multiple negative reviews.

55.     Uber's true stance on driver safety is revealed in the waiver it forces every customer to execute when they first register as an Uber user.  Uber refuses to take responsibility for anything relating to the "reliability, timeliness, quality, suitability, or availability of the services or any services or goods requested through the use" of their services.  Neither does Uber make any guarantees with respect to "the quality, suitability, safety or ability of third party providers." *See* https://www.uber.com/legal/terms/us/.

### Uber Discriminates Against Disabled, Elderly and Riders Without Credit Cards and Smartphones

56.     The Taxi Rules require that every licensed taxi company in Boston must be part of a Radio Association, if they have more than 3 cabs.  The Taxi Rules include multiple provisions that protect disabled and elderly riders against discrimination.

57.     The Taxi Rules mandate that taxis cannot discriminate against any potential passengers.  For example, the City of Boston Rules state that:

A Hackney Carriage Driver may not refuse any passenger on the basis of race, sex,

13

religion, disability, sexual orientation, national origin, or location of the passenger's pick-up or destination in any circumstance.

*See* Rule 403, Section 5(II)(p)

58.     Uber-affiliated drivers can unlawfully ignore this requirement without any

adverse consequences.

59.     Boston taxi drivers are required to accept multiple forms of payment, including

cash, credit cards, vouchers, or include elderly discounts, and Boston Taxi Industry Elderly

Program (BTIEP) coupons, which allow customers who are elderly, handicapped, disabled or

suffer from cancer to pay discounted rates. *See* Rule 403, Section 9(II)(b)[5].  Uber drivers cannot

accept cash, coupons or vouchers.  All payments are charged automatically to the customer's

preauthorized credit card.  Uber's credit-card-only payment system discriminates against

individuals without credit cards, and discriminates unlawfully against elderly, handicapped,

disabled and cancer patients, who have the legal right to use BTIEP coupons to pay for taxi trips.

### *Uber Charges Illegal Fares*

60.     The Taxi Rules protect consumers by establishing stable, uniform fares.  Charges

for trips within each respective municipality and to nearby suburbs ("Meter Rate Communities")

must be displayed on a city-inspected and sealed taximeter that calculates the fare based on time

and distance.  For example, trips to more distant towns are set by the Flat Rate Handbook in the

City of Boston. *See* Rule 403, Section 10(II)(c)[6].

61.     UberX does not obey these fare limits.  Instead, Uber charges a flat rate plus

additional charges per-mile or per-minute, depending on the vehicle's speed.  This unlawful

variation in taxi rates violates the Taxi Rules' policy in favor of uniform, non-discriminatory

---

[5] The City of Cambridge imposes a similar requirement. *See Taxicab Rules and Regulations,* Art. X, Rule 13; Art. XIII, Rule 10.
[6] Similarly, in Cambridge, the License Commission establishes a "Flat Rate Guide" for cities and towns outside the immediate vicinity of Cambridge. *See Taxicab Rules and Regulations* Art. XIII, Rule 8.

charges for taxi service.

62.     Uber's illegal fares for UberX become even more exploitative in times of high demand.  During these periods, Uber imposes "surge pricing," a multiple of its base fare structure.  Surge pricing is an additional unlawful method by which UberX cars unfairly compete against licensed taxis because licensed taxis cannot charge more than the rates prescribed by the Taxi Rules.

### *Uber Operates an Illegal Dispatching Service*

63.     As stated above, Boston requires that every taxi join a Radio Association if they operate more than 3 cabs.  Each Association must have a membership of at least forty cabs in the City of Boston.  Approved Radio Associations are legally required to provide a broad range of services to assist the police and protect consumers.  Each Association is required to make taxis available to the elderly and handicapped passengers.  In Boston, these services include:

i.      Twenty-Four (24) Hour Dispatch Capabilities;
ii.     Two-Way Radio and Dispatch Service [amended by ix, below];
iii.    Wheelchair Accessible Vehicle (WAV) Availability;
iv.     Elderly Discount Re-imbursement Services;
v.      Call/Dispatch Record Keeping and Reporting;
vi.     Lost Or Found Property Reporting Procedures; and
vii.    Dispatch services shall include record keeping that specifies:
    (1)    the total number of calls for service;
    (2)    the time and location of each request;
    (3)    the Medallion number of the cab dispatched; and
    (4)    the time and location of WAV's dispatched.
viii.   Global Positioning System tracking devices are mandatory and all Hackney Carriages shall be equipped with a GPS system approved by the Inspector of Carriages which shall allow the Inspector of Carriages and Medallion Owner to ascertain the whereabouts, activities and fare data of each vehicle via the internet at all times. Said system shall store such information in a retrievable form for 365 days. The association must provide the Inspector of Carriages with the user name and password necessary to access said system. Such information shall be searchable for the following data.
    •    Date, time, and location of passenger pick-up and drop-off
    •    Trip duration measured in time and mileage
    •    Trip number

- Itemized fare (tolls, surcharges, and tip amount for card payments)
- Payment type (Cash, Credit, Debit, Student ID, Voucher)
- Last four (4) digits of customer credit/debit, etc. account number
- Hackney Medallion number
- Hackney Driver's License number
- Status codes
- Date and time of taxicab dispatch
- "Breadcrumb trail" GPS-based location data. (real-time and historical)

ix.   GPS enhanced dispatch services which enable the radio association to dispatch the Boston Licensed Taxi which can arrive at the location most quickly. Said system shall be equipped with a panic button utilized by the driver which will automatically notify the dispatcher of an emergency and the vehicle's location.

*See* Rule 403, Section 7(I)(d)[7].

64.    Only an approved Radio Association can dispatch taxis in Boston. *See* Rule 403, Section 7. Uber is not, and has never sought to be, an approved Radio Association.  Uber violates the law every time its computers cause an UberX car to be sent to an Uber customer in Boston.

65.    Uber benefits financially by enlisting UberX car owners who have no medallions, no licenses and are not members of a Radio Association.  By violating the licensing and Radio Association requirements, Uber unlawfully evades any investment in medallions, cars, Wheelchair Accessible Vehicles, registrations, insurance, dispatching equipment, protective partitions, taximeters, credit card machines, and other public safety and anti-discrimination requirements imposed by the Taxi Rules.  In violating the Taxi Rules with its affiliated UberX vehicles, Uber puts the public at risk for its own economic benefit.

A.     *Quality of Drivers*: The Taxi Rules require all drivers to hold a license to operate a taxi, which is only granted to applicants who meet the Taxi Rules' standards for testing, training, criminal record, driving record, drug use and sex offender status.  Taxi holders are held to an extensive set of rules, requiring them to (for example):

---

[7] The City of Cambridge imposes similar requirements. *See Taxicab Rules and Regulations,* Art. XIX, Rule 8 and 9.

i.   not possess alcohol or permit open alcohol containers in their vehicle;
ii.  not talk on a cell phone;
iii. not smoke or permit smoking; and
iv.  not discriminate against potential customers based on race, sex, religion, disability, sexual orientation, national origin, pickup location or destination or intoxication.

*See* Rule 403, Section 5(II)[8].

These rules are enforced by the Inspector of Carriages, who can conduct hearings on complaints and suspend or revoke a license.  In contrast, Uber does not require UberX drivers in Boston to have anything more than a conventional Driver's License.

B.     *Quality of Owners*: Boston issues a limited number of medallions and the city of Boston reviews each medallion and license holder applicant for suitability. *See* Chapter 392 of the Acts of 1930; Rule 403, Section 2(II)(b)(i)[9].  License owners can be required and must provide the Inspector of Carriages with the names of every individual and organization with an ownership interest in the medallion. Uber enlists as many UberX cars as it can, often dealing with individuals or small companies with a single car.  Uber knows virtually nothing about the financial stability, citizenship, litigation record, affiliations or control of the car owners that it describes as its "partners."

C.     *Quality of Cars*: UberX cars lack essential protections required by the Taxi Rules for all dispatched-on-demand transportation services in Boston. For example, in the City of Boston:

i.   *Protective Partitions*: Rule 403 mandates that all Boston cabs have a protective barrier of metal and lexan between the front and back seats. *See* Rule 403 Section (3)(III)(c)(iii)[10].  These barriers not only protect drivers from

---

[8] The City of Cambridge imposes similar requirements. *See Taxicab Rules and Regulations,* Art. XI.
[9] The City of Cambridge imposes similar requirements. *See Taxicab Rules and Regulations,* Art. VII.
[10] The City of Cambridge imposes similar requirements. *See Taxicab Rules and Regulations*, Art. X, Rule 14.

assault and theft; they also prevent drunk or drugged passengers from interfering with the driver and causing accidents. Uber's marketing touts the capacity of its UberX vehicles that increases the risk that boisterous passengers will distract the driver—or worse. UberX vehicles have no partitions, thereby putting drivers at risk and undermining a critical public safety program of the City of Boston.

ii. <u>GPS *Tracking and Panic Buttons*</u>: Every Boston cab must be equipped with an Inspector-approved GPS system that gives the Boston Police: internet access, both in real time and for a year after any trip, to the location of every cab; the pick-up and drop-off points; how the passenger paid, and the exact route followed. Every cab must also be equipped with a panic button that automatically sends the dispatcher an emergency signal and the location of the cab. UberX vehicles have no such approved equipment.

iii. *Taximeters and Flat Rates*: The fare for every Boston taxi trip is set by an inspected and sealed taximeter or the Flat Rate Handbook, thereby ensuring that every customer pays the same rate.[11] UberX does not comply with these legally-mandated maximum rates. Fares are set by Uber's proprietary algorithm. Uber also uses "surge" pricing "during times of high demand." Uber takes advantage of this price gouging to increase prices on roughly 40% of Uber trips.

*See* https://www.bostonglobe.com/metro/2016/01/04/surge-pricing-charged-for-percent-uber-trips-new-year-eve/kJaQaEv1ImAISMnSV7EjeM/story.html.

***Uber Unfairly Competes With Licensed Cabs That Comply With the Taxi Rules***

---

[11] The City of Cambridge imposes similar requirements. *See Taxicab Rules and Regulations*, Art. X, Rule 6.

66.     UberX directly competes with taxis operating in Boston and Cambridge.

67.     Taxis operating in Boston and Cambridge must comply with regulations that: protect the public from harm; prohibit discrimination against the disabled, the elderly, and set maximum fares to protect the consumer.  To comply with these regulations, cabs must invest in equipment, training and licenses, charge only prescribed fares, and serve all areas.  In contrast, UberX vehicles ignore the Taxi Rules and require consumers to use a credit card.

68.     On information and belief, many of the UberX vehicles also compete unfairly by unlawfully purchasing regular car insurance.  In Massachusetts, many taxis are insured through the assigned-risk CAR program established by M.G.L. c. 175, § 113H. The CAR program insurance charges premiums for taxis.  UberX vehicles that purchase regular car insurance compete unfairly by functioning as taxis while paying substantially lower insurance rates than taxis.  Uber and any affiliates who improperly obtain car service insurance are also putting customers at risk, as insurers may disclaim coverage for UberX vehicles that have not paid taxi insurance rates.

### Uber's Anti-Competitive Conduct

69.     In February 2013, when Uber launched UberX in Boston, it charged prices higher than taxicab rates but lower than UberBlack rates.  Uber promoted UberX as costing 40% lower than UberBlack.  In early 2013, UberX cost $5.00 for the base rate in the Boston area.

70.     As demand for UberX increased between early 2013 and October 2013, Uber began offering free rides in Boston. *See* https://newsroom.uber.com/us-massachusetts/bosfreeuberxweek/.

71.     As demand further increased, Uber decreased the base rate for UberX services in the Boston area to $2.50, thereafter promoting that rides were "now 30% cheaper than a taxi!"

and provided the following:

|  | OLD RATES | NEW RATES |
|---|---|---|
| Base Fare | $5.00 | $2.50 |
| Per Minute (Below 11 MPH) | $0.60 | $0.40 |
| Per Mile (Above 11 MPH) | $2.60 | $2.05 |
| Minimum Fare | $10.00 | $4.00 |

(https://newsroom.uber.com/us-massachusetts/new-uberx-prices-now-30-cheaper-than-a-taxi/)

SAMPLE FARES

|  | NEW uberX RATES | OLD uberX RATES | TAXI |
|---|---|---|---|
| Back Bay to Downtown | $8 | $10 | $11 |
| Logan Airport to Financial District | $18 | $24 | $27 |
| Cambridge to South End | $12 | $17 | $19 |

(https://newsroom.uber.com/us-massachusetts/new-uberx-prices-now-30-cheaper-than-a-taxi/).

72.    Upon information and belief, Uber lost money on each and every UberX ride provided in the Ride-Hail Market after offering free rides and subsequently reducing prices in October 2013.

73.    Upon information and belief, at the same time it lowered UberX rates in the Ride-Hail Market, Uber reduced its commission on each UberX ride to subsidize the income lost by UberX drivers due to the price cuts.

74.    Upon information and belief, Uber lost money on each and every UberX ride in

the Ride-Hail Market under this pricing structure.

75.    In January 2014, Uber further reduced fares by 15-34%, advocating that "[o]n average across all Uber cities, UberX is 26% cheaper than a taxi," providing the following example:

| | uberX | Taxi |
|---|---|---|
| **BOSTON** | | |
| Beacon Hill to Harvard Square | | |
| | $12.55 | $19.37 |

(https://newsroom.uber.com/situation/).

76.    In April 2014, Uber restored its commission on UberX rides to 20 percent but did not return UberX prices to pre-January levels.  This resulted in the drivers suffering a 15 percent reduction in income compared to the prior structure.

| | Old (uberX) | New (uberX) |
|---|---|---|
| **Fare** | $10.00 | $10.00 |
| **Safe Rides Fee** | -- | $1.00 |
| **Total Rider Payment** | $10.00 | $11.00 |
| **Partner Earnings Description** | 95% of $10.00 Fare | 80% of $10.00 Fare |
| **Trip Partner Earnings** | $9.50 | $8.00 |
| **$1 per Trip (thru Aug 31st)** | $0 | $1.00 |
| **Total Partner Earnings** | $9.50 | $9.00 |

(http://www.geekwire.com/2014/uber-adds-1-safe-rides-fee-passengers/).

77.    In June 2014, Uber further reduced UberX prices by 25 percent making it half the price of a taxi.

78.    To publicize the drastic undercutting of the prices charged by the taxicab industry, Uber posted the following graphic:



(https://newsroom.uber.com/us-massachusetts/uberx-in-boston-just-got-even-cheaper/).

79. Upon information and belief, Uber paid its drivers more than Uber charged passengers under the new pricing program. Though UberX passengers paid only 75 percent of the January 2014 rates due to the 25 percent price-reduction, Uber continued to pay UberX drivers 80 percent of the January 2014 rates – meaning Uber paid to the driver the entire amount collected from the passenger plus an additional 5 percent for each UberX ride.

80. When Uber stopped subsidizing UberX drivers' income in the Ride-Hail Market in September 2014, Uber increased their commissions to a high of 25%.

81. Upon information and belief, the June 2014 price cuts lowered UberX prices and Uber lost money on each and every UberX ride under the pricing structure implemented in June 2014.

82. Upon information and belief, beginning in at least June 2014 and continuing through the present date, Uber has lost and continues to lose money on each and every UberX

ride provided in the Ride-Hail Market.

83.    Uber has been able to maintain its below-cost predatory pricing for its UberX services in the Ride-Hail Market due to vast reserves of capital invested with the expectation of reaping extraordinary future returns.

84.    In adopting this approach, Uber has deflated fares of UberX to prices below cost in an effort to drive competitors of UberX (all taxis) from the market in the hope of recouping its losses once Uber's competition has been destroyed. In fact, Uber has lost as much as $2 billion a year via this overall plan to monopolize the Ride-Hail Market. *See* http://www.bizjournals.com/sanjose/news/2016/12/02/uber-fares-cover-less-than-half-of-ride-costs-new.html?ana=twt.

85.    Uber's intent to monopolize the Ride-Hail Market and injure competitors has been made clear through the statements of its Chief Executive Officer Travis Kalanick and Uber's advertising that highlights its unilateral price war in the Ride-Hail Market.

86.    Supported by billions of dollars in venture capital, allowing it to operate at enormous losses due to below-cost pricing, Uber's plan is to drive all Plaintiffs' cab companies out of business.  Uber has a dominant share in the Ride-Hail Market. Uber has captured more than 80 percent of the Ride-Hail Market.  Left unchecked, Uber is likely to succeed in establishing complete domination of the market by forcing out all competitors through its predatory pricing practices. Once its competitors have been removed and free of the constraints of competition, Uber will be free to implement unfettered price increases for its services, and consumers will be left with no choice but to pay the prices – however exorbitant – demanded by Uber.

87.    As a result of Uber's unfair competition and antitrust activity above, Plaintiffs

have lost, inter alia, substantial profits as a result of lost fares to Uber, and substantial devaluation of their assets (medallions/licenses), and will continue to suffer damages unless Uber's conduct is restrained.

88.    Uber's acts as set forth above have also caused and will continue to cause harm to competition in the Ride-Hail market.

89.    Uber's dominant position and considerable name recognition have made it difficult for potential competitors to enter the market.

90.    Uber introduced the UberX service which directly competes with the plaintiffs in the Ride-Hail market in early 2013.  Prior to Uber's entry into the market with UberX, the plaintiffs, and other cab companies similarly situated to the plaintiffs, enjoyed at least 90% of the market, competing with one another for fares in their respective communities.  The competition in the market prior to Uber's entrance was principally based upon service, reputation and the like.  It was not based upon the price of the fare because that price was set by the respective municipality.

91.    Since Uber's entry into the market with UberX in early 2013, it has destroyed competition in the market by ignoring the rules and regulations of the respective communities, and predatorily pricing the fares resulting in the denigration of the market.

92.    More particularly, in the market today, Uber, through its unfair practices and predatory pricing, has captured in excess of 80% thereof, and substantially diminished the market share of the plaintiffs, and other similar cab companies, to around 20%.

93.    If allowed to continue with its unfair practices and predatory pricing strategy, Uber, in the short term, will drive all plaintiffs out of the market allowing it to control the market and set fares at its own will thus causing irreparable damage in the market.

94.    Below are the financial differences between taxis and TNCs as a result of the disparate treatment by the TNC Law in the regulation of taxis and TNCs:

| ITEM | TAXIS | TNCs |
|---|---|---|
| Medallion Value | $335,000 – 700,000 | $0 |
| Vehicle Insurance | $5,000 – $10,000 | $400 – $1,000 |
| Vehicle Purchase | $20,000 - $30,000 | Vehicles 10 years old |
| Vehicle Setup (vinyl seats, vinyl floor, partition, emergency lights, lettering) | $2,000 | $0 |
| Tinted Glass Removal | $1,000 | $0 |
| Hackney License | $32 | $0 |
| Fingerprinting | $50 | $0 |
| Medallion Renewal | $100 | $0 |
| Meter Seal | $40 | $0 |
| BTEIP elderly handicapped | $150 | $0 |
| Radio Associations | $20 – $50/wk | $0 |
| Meter Rates | $2.60 base/ 0.40¢ per1/7 mile $2.80/mile $28 wait time/ Flat rate $3.20 | $2 Base rate/ $1.24 mile/ $1.15 service fee |
| Corporation Taxes | $456 | $0 |

## COUNT I
### (UNFAIR COMPETITION IN VIOLATION OF M.G.L. c. 93A, § 11)

95.    Plaintiffs incorporate the allegations of Paragraphs 1-94 of this Complaint.

96.    By unlawfully operating its UberX transportation services without incurring the expense of compliance with Massachusetts and Boston laws, as alleged above, Uber unfairly competes with Plaintiffs, in violation of M.G.L. c. 93A, § 11.

97.    Uber's unlawful competition has caused harm to Plaintiffs by diverting revenues that would otherwise be paid to taxis and by reducing the value of taxi medallions and such harm will continue unless and until such unlawful competition is enjoined.

## COUNT II
### (COMMON LAW UNFAIR COMPETITION)

98.     Plaintiffs incorporate the allegations of Paragraphs 1-97 of this Complaint.

99.     By unlawfully operating its UberX transportation services without incurring the expense of compliance with Massachusetts and Boston laws, as alleged above, Uber unfairly competes with the plaintiffs.

100.    Uber's unfair competition has caused harm to Plaintiffs by diverting revenues that would otherwise be paid to taxis and by reducing the value of taxi medallions and such harm will continue unless and until such unlawful competition is enjoined.

## COUNT III
### (ATTEMPTED MONOPOLIZATION - SHERMAN ANTITRUCT ACT, 15 U.S.C. § 2)

101.    Plaintiffs incorporate the allegations of Paragraphs 1-100 of this Complaint.

102.    The purpose of the antitrust laws of the United States is to preserve and advance our system of free and open competition and to secure to everyone an equal opportunity to engage in business, trade, and commerce for the purpose of ensuring that the consuming public may receive better goods and services at lower cost.

103.    The Sherman Antitrust Act prohibits anticompetitive conduct carried out for the purpose of achieving monopoly power in any part of interstate or foreign trade or commerce.

104.    Through the actions described above, Uber has engaged in exclusionary conduct through below-cost pricing carried out with the specific intent of achieving monopoly power in the Boston Ride-Hail Market and of obstructing, restraining and excluding competition.

105.    There is a dangerous probability that Uber will achieve its goal of obtaining monopoly power in the Boston Ride-Hail Market if it continues to engage in the conduct described herein because Uber has sufficient market power to and actually does exclude its

26

competitors through the use of below-cost pricing.

106. Uber's anticompetitive conduct described herein violates the Sherman Antitrust Act, and the injuries caused by Uber's anticompetitive conduct are the type intended to be prevented by the Sherman Antitrust Act.

107. As a direct result of Uber's conduct, Uber has damaged the Boston Ride-Hail market as set forth above.

108. As a direct and proximate result of Uber's attempt to achieve monopoly power through anticompetitive conduct, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial. Such damages will continue unless and until Defendant is enjoined.

**COUNT IV**
(ATTEMPT TO MONOPOLIZE UNDER M.G.L.A. c. 93 § 5)

109. Plaintiffs incorporate the allegations of Paragraphs 1-108 of this Complaint.

110. The purpose of the antitrust laws of the Commonwealth of Massachusetts is to preserve and advance our system of free and open competition and to secure to everyone an equal opportunity to engage in business, trade, and commerce for the purpose of ensuring that the consuming public may receive better goods and services at lower cost.

111. Through the actions described above, Uber has engaged in exclusionary conduct through below-cost pricing carried out with the specific intent of achieving monopoly power in the Boston Ride-Hail Market and of obstructing, restraining and excluding competition.

112. There is a dangerous probability that Uber will achieve its goal of obtaining monopoly power in the Boston Ride-Hail Market if it continues to engage in the conduct described herein because Uber has sufficient market power to and actually does exclude its competitors through the use of below-cost pricing.

113. Uber's anticompetitive conduct described herein violates Chapter 93, and the

27

injuries caused by Uber's anticompetitive conduct are the type intended to be prevented by Chapter 93.

114.    As a direct and proximate result of Uber's attempt to achieve monopoly power through anticompetitive conduct, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.  Such damages will continue unless and until Defendant is enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

A.    enter judgment in favor of the Plaintiffs on all counts of the Complaint;

B    award Plaintiffs damages caused by Defendant's unfair competition;

C.    award Plaintiffs damages caused by Defendant's violation of the Federal and State antitrust laws;

D.    award Plaintiffs treble damages, costs and attorney's fees;

E.    enjoin Defendant's unfair and antitrust conduct; and

F.    award Plaintiffs such other and further legal and equitable relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts of the complaint so triable.


Dated: April 26, 2017                    Respectfully submitted,

                                         */s/ Thomas C. O'Konski*
                                         Thomas C. O'Konski, BBO #378265
                                         Paul J. Hayes, BBO #227000
                                         Daniel McGonagle, BBO #690084
                                         Prince Lobel Tye LLP
                                         One International Place - Suite 3700
                                         Boston, MA 02110
                                         Tel: 617-456-8000
                                         Email: tokonski@princelobel.com
                                         Email: phayes@princelobel.com
                                         Email: dmcgonagle@princelobel.com

                            **ATTORNEYS FOR THE PLAINTIFFS**

                            **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by the Court's CM/ECF system in accordance with LR 5.4(C).

                                         */s/ Thomas C. O'Konski*
                                         Thomas C. O'Konski